UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 04-20755-CIV-JORDAN



NOVA CASUALTY COMPANY,  )
      Plaintiff  )
  )
vs.  )
  )
RICHARD WASERSTEIN, et al.,  )
  )
      Defendants  )
_____  )

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In an order issued this past March [D.E. 116], I granted partial summary judgment in favor of Nova Casualty and against Richard Waserstein and 1108 Concourse, L.C.. I concluded that, in light of the policy's pollution exclusion cause, Nova did not have a duty to defend or indemnify Mr. Waserstein or 1108 with respect to state court lawsuits filed against them alleging exposure to chemicals, particles, toxicants, microbials, and microbial contaminants. I denied summary judgment, however, with respect to the defense of promissory estoppel raised by Mr. Waserstein and 1108.

The promissory estoppel defense was tried on October 3, 2006. Based upon the evidence presented at trial, the arguments of counsel, and the applicable law, I issue the following findings of fact and conclusions of law, and find in favor of Nova on the promissory estoppel defense. A final judgment will be issued separately.[1]

### I. PRINCIPLES OF PROMISSORY ESTOPPEL

Mr. Waserstein and 1108 contend that they are entitled to coverage, despite the pollution exclusion, under the doctrine of promissory estoppel. In Florida, "the general rule in applying equitable estoppel to insurance contracts provides that estoppel may be used defensively to prevent a forfeiture of insurance coverage, but not affirmatively to create or extend coverage." *Crown Life*

---

[1] Nova's motion to exclude the testimony of Albert Eskenazi [D.E. 124] is denied. Mr. Waserstein disclosed Mr. Eskenazi at his deposition in August of 2005, and Nova and Mr. Waserstein listed Mr. Eskenazi as a witness in the pretrial stipulation filed in September of 2005. Nova did not object to Mr. Eskenazi at that time, and did not request that the discovery period be reopened so that it could depose Mr. Eskenazi..

*Ins. Co. v. McBride,* 517 So.2d 660, 661 (Fla. 1987). There is an exception to this general rule, but it

> only applies where to refuse to enforce a promise . . . would be virtually to sanction the perpetration of fraud or would result in other injustice. . . . Such injustice may be found where the promisor reasonably should have expected that his affirmative representations would induce the promisee into action or forbearance substantial in nature, and where the promisee shows that such reliance thereon was to his detriment.

*Id.* at 662 (citations omitted). The Florida Supreme Court has described this promissory estoppel exception as "very narrow." *AIU Ins. Co. v.v Block Marina Inv., Inc.,* 544 So.2d 998, 1000 n.1 (Fla. 1989).

Mr. Waserstein and 1108 bear the burden of proving promissory estoppel by clear and convincing evidence. *See W.R. Grace & Co. v. Geodata Services, Inc.,* 547 So.2d 919, 924 (1989); *McBride,* 517 So.2d at 663 (Grimes, J., specially concurring); *State Farm Mutual Auto. Ins. Co. v. Hinestrosa,* 614 So.2d 633, 636 (Fla. 4th DCA 1992); *Professional Underwriters Ins. Co. v. Freytes & Sons Corp.,* 565 So.2d 900, 902 (Fla. 5th DCA 1990). To satisfy the clear and convincing standard, the evidence must be more than a preponderance, but the proof need not be beyond and to the exclusion of a reasonable doubt. *See In re Davey,* 645 So.2d 398, 404 (Fla. 1994). "This intermediate level of proof entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitation." *Id.*

## II. FINDINGS OF FACT

Mr. Waserstein has been an attorney since 1986, and owns a title company. He is a principal/member of 1108, which was formed in 1999 for the purpose of acquiring a building located at 1108 Kane Concourse. Mr. Waserstein and 1108 intended to perform certain renovations to the building after they acquired it.

### A. THE ACQUISITION OF THE NOVA POLICIES AND CU'S ALLEGED REPRESENTATION

In January of 2000, Right before the closing on the purchase of the building, Mr. Waserstein contacted Combined Underwriters ("CU"), an insurance agent/broker, and informed CU that he needed insurance for the building. He also informed CU that there would be renovations (such as enclosing the atrium and adding windows). CU obtained package commercial coverage for 1108

through Underwriters at Lloyd's of London for the period of January 28, 2000, to January 28, 2001, for a premium of $12,268. 1108, pursuant to CU's instructions, paid the premium directly to CU. This Lloyd's policy had various exclusions, such as exclusions for "lead hazard;" "nuclear energy liability;" "asbestos, silica dust, toxic substance;" and "asbestos." Significantly, one of the exclusions was for "seepage and/or pollution and/or contamination." Consistent with his practice, Mr. Waserstein did not read or review the 2000-2001 Lloyd's policy. He also did not discuss the topic of exclusions with CU.

In January of 2001, 1108, through Mr. Waserstein, renewed the Lloyd's policy through January 28, 2002, for a premium of $11,193, which was paid directly to CU. This 2001-2002 Lloyd's policy contained the same exclusions as the prior Lloyd's policy, including the "seepage and/or pollution and/or contamination" exclusion. Mr. Waserstein did not read or review the 2001-2002 Lloyd's policy.

On January 23, 2002, Gina Lopez, the insurance agent at CU in charge of the Waserstein/1108 account, send a fax to Mr. Waserstein concerning renewal of the policy for the building. Ms. Lopez explained that Lloyd's was not renewing the policy, and that the insurance market was difficult due to the lack of reinsurance capacity as to windstorm exposure. Ms. Lopez attached several insurance proposals from other carriers (i.e., Seneca Insurance for property, Commercial General for liaibility, and the Florida Windstorm Underwriting Association ("FWUA") for windstorm, with a total combined premium of $13,200), and informed Mr. Waserstein that CU was looking for other possible carriers.

At 3:23 p.m. on Friday, January 25, 2002, just a couple of days before the Lloyd's policy was to expire, Ms. Lopez sent another fax to Mr. Waserstein. This fax included a "much better" quote on coverage through Nova (with windstorm coverage through the FWUA). The one page-summary proposal for Nova indicated that property and liability coverage would cost a total of $6,369, and the one-page summary for the FWUA indicated that windstorm coverage would cost $3,052, for a total premium of $9,421. The half-page Nova liability coverage summary listed only the limits of liability

(e.g., "$1,000,000 each occurrence"), and did not mention any exclusions.[2] Ms. Lopez asked Mr. Waserstein, if he agreed with the proposal, to "sign and fax to our office to bind coverage."

Two minutes later, at 3:35 p.m., Mr. Waserstein signed, and faxed to CU, a commercial insurance application which listed CU as the producer and Nova as the carrier. The application did not list or mention any exclusions to Nova's coverage. Nova bound coverage at 4:05 p.m. The Nova memorandum to CU binding coverage, which Mr. Waserstein did not receive, indicated in summary form that certain exclusions – including a "total pollution" exclusion – applied. On January 29, 2002, 1108, pursuant to CU's instructions, paid the premium of $9,421 to CU for coverage (with Nova and the FWUA) for the period from January 28, 2002, to January 28, 2003.

Sometime in January of 2002, 1108 and its contractors obtained the permits for the planned construction/renovation work in the building. Due to delays, however, the work did not begin until March of 2002.

On February 12, 2002, CU, through agent Maria Barrionuevo (who was also acting as a customer service representative), sent Mr. Waserstein a copy of the 2002-2003 Nova policy. Mr. Waserstein received the policy several days later, but – as was his custom or practice – did not review it or read it. Had Mr. Waserstein looked at the policy, he would have noted that the first page of the policy (entitled "New Business Declaration") lists "common forms that apply to all coverage parts," including a "total pollution exclusion." [3]

In March of 2002, after he received the Nova policy from CU, Mr. Waserstein met with Albert Eskinazi of Deco Builders, whom 1108 had hired to install windows on the second floor of the building. Mr. Eskinazi suggested to Mr. Waserstein that he should check to make sure he had appropriate insurance for the construction/renovation work that was about to begin. Mr. Waserstein

---

[2]Marta Barrionuevo, who was a CU agent/customer service representative at the time, testified that standard exclusions, like a pollution exclusion, would not be listed on a one-page insurance proposal. I find her testimony on this point credible, as it is impossible to summarize on one page all exclusions in a commercial property/liability package policy.

[3]At no time from 2002 through 2004 did Mr. Waserstein ask CU or Nova for a more narrow or more limited pollution exclusion.

4

called CU and spoke to Ms. Barrionuevo.[4] He told her that extensive construction was about to begin, and that Bank of America was going to leave its employees in the building during the construction. He asked her if he was covered and whether he needed additional insurance. Ms. Barrionuevo put Mr. Waserstein for a couple of minutes, and then told him he was covered and did not need to buy additional insurance.[5] During this conversation, Mr. Waserstein and Ms. Barrionuevo did not specifically discuss "exclusions" to the policy.

In purported reliance on Ms. Barrionuevo's statement, Mr. Waserstein did not seek to purchase any other insurance for 1108. According to Mr. Waserstein, he could have purchased other insurance to cover the gap left by the total pollution exclusion. There was no testimony or evidence, however, as to whether such other insurance was available, what if any limitations such coverage would have contained, what the cost would have been, or whether 1108 would have qualified for coverage.

In early January of 2003, Nova informed CU that 1108's policy would not be renewed unless it was direct-billed (i.e., unless premiums were paid directly to Nova). On January 15, 2003, Ms. Barrionuevo sent a letter to Mr. Waserstein concerning renewal of the Nova policy. She informed him that the premium for renewal of the Nova coverage would be $7,217. Despite the fact that the policy was to be direct-billed by Nova, Ms. Barrionuevo enclosed an invoice from CU for payment. On or about January 21, 2003, Mr. Waserstein signed the renewal application. Attached to the

---

[4]I credit Mr. Waserstein's testimony that he spoke to someone at CU that day, and conclude, based on all of the evidence, that Mr. Waserstein spoke to Ms. Barrionuevo, and not Ms. Lopez. Ms. Lopez testified that she never spoke to Mr. Waserstein about whether he had coverage for anything arising out of the construction/renovation, or whether he was "fully covered," and I find her testimony credible. In fact, Mr. Waserstein never told Ms. Lopez that there would be construction at the building.

[5]I do not credit Mr. Waserstein's trial testimony that he asked Ms. Barrionuevo whether he was "*fully* covered" or "*100%* covered." Instead, consistent with the answers to interrogatories submitted by Mr. Waserstein I find that Mr. Waserstein only asked whether he was covered for the construction work that was about to begin, and that the representation made to him by Ms. Barrionuevo was that he was covered for such work (not that he was "*fully* covered" or "*100%* covered"). In light of the numerous provisions and exclusions in the Nova policy then in effect, I find it implausible that anyone at CU would have told Mr. Waserstein that he had 100% coverage. Such coverage simply does not exist in any policy that I know of.

renewal application were several pages entitled "Property Section." The first of these pages, in a section entitled "Additional Coverages, Options, Restrictions, Endorsements, and Rating Information," contained the following notation: "Policy exclusions but not limited to: windstorm and hail, nuclear energy, flood." On January 21, 2003, 1108 paid CU the entire 2003-2004 premium, and CU, after negotiating the check, issued its own check to Nova for the entire premium.

On January 29, 2003 – after CU had negotiated 1108's check – Nova sent Mr. Waserstein and 1108 a premium due notice together with a renewal certificate and various portions of the 2003-2004 policy. The cover sheet of the renewal certificate (which listed CU as the agent for Nova) listed the "total pollution exclusion." Mr. Waserstein did not read or review the 2003-2004 renewal certificate/ policy.

On January 26, 2004, Ms. Barrionuevo sent Mr. Waserstein a letter concerning renewal. She explained that the premium for 2004-2005 was going to be $7,571, and that Nova would be sending 1108 an invoice requiring payment of 20%. On or about February 3, 2004, 1108 wrote a check to CU for the entire premium. CU deposited the check and then sent its own check in the same amount to Nova.

In late January or early February of 2004, Nova sent 1108 a premium due notice, together with a 2004-2005 renewal certificate. This renewal certificate, like the first page of the 2002-2003 policy and the 2003-2004 renewal certificate, listed a "total pollution exclusion." It also listed CU as the agent for Nova. Nova later sent 1108 an amended 2004-2005 declaration. This document also listed CU as Nova's agent, and also listed the "total pollution exclusion." Mr. Waserstein did not read any of the 2004-2005 insurance documents.

### B. CU'S AGENCY/APPARENT AUTHORITY

The 1998 brokering agent agreement between Nova and CU – which was in effect through 2004 – provides that CU will act (on a commission basis) as a non-exclusive brokering agent/producer for Nova in Florida. It also provides that CU does not have the authority to bind risks. Indeed, as confirmed in the brokering agent's procedural checklist, Nova has never given CU the authority to bind it or make representations on its behalf as to what is or is not covered, or as to whether a certain type of policy would or would not have certain exclusions. Nova is not bound by any representations as to coverage made by CU.

The brokering agreement further provides that CU is responsible for collecting premiums and paying Nova even if the clients do not pay CU. As noted above, CU accepted premium payments from clients like 1108 who were on direct-bill status, even though the payments were supposed to go directly to Nova.

Nova provided some forms to CU on certain lines of insurance (e.g., the artisans contractors program) for its use, and gave CU an agent number which was listed on policies, including those issued to 1108. CU had to give Nova a security interest, and CU's principal, Ronald Laster, had to give Nova a personal guaranty. Nova set a target goal for CU of producing four new submissions per month.

Mr. Waserstein was never told of any limitations on CU's authority. Mr. Waserstein testified that, based on course of dealing, he believed CU was Nova's agent and could bind Nova, and he assumed or presumed that CU could make representations as to coverage on behalf of Nova. On the other hand, he also acknowledged that one at Nova ever told him that CU had the authority to bind coverage or make representations about coverage or exclusions.

### III. DISCUSSION

There are several reasons why Mr. Waserstein and 1008 cannot prevail on their promissory estoppel defense.

First, assuming that, under cases like *Almerico v. RLI Ins. Co.*, 716 So.2d 774 (Fla. 1998), CU was Nova's agent for the purpose of accepting insurance applications and premiums, and for the purpose of temporarily binding coverage upon receipt of the application and payment, CU was not Nova's agent for the purpose of making representations as to what was covered or not covered once Nova issued a policy. *See Steele v. Jackson Nat. Life Ins. Co.*, 691 So.2d 525, 527 (Fla. 5th DCA 1997) (independent insurance agent can be agent of insurance company for one purpose and agent of insured for another purpose); *Boulton Agency, Inc. v. Phoenix Worldwide Ind., Inc.*, 698 So.2d 1248, 1250 (Fla. 3rd DCA 1997) (finding that there was sufficient evidence that insurance broker was not insurer's agent "for the purpose of setting policy limits," and reversing directed verdict). CU certainly did not have actual authority to make such representations on Nova's behalf, and nothing presented at trial remotely even suggested that CU had any apparent authority to do so.

Second, even if CU had apparent authority to make representations as to coverage on Nova's behalf, the representation made by Ms. Barrionuevo to Mr. Waserstein – that he was covered for the construction work and did not need to purchase additional insurance – was not specific enough to constitute a representation about pollution coverage for purposes of promissory estoppel. *See generally Vencor Hospitals v. Blue Cross & Blue Shield of Rhode Island,* 284 F.3d 1174, 1185 (11th Cir. 2002) (adopting decision of district court, which explained that, under Florida law, "promissory estoppel does not apply if the terms of the promise are indefinite"). Mr. Waserstein and Ms. Barrionuevo did not discuss exclusions during their conversation, and no representations were made as to any specific kind of coverage. *See, e.g., Freytes & Sons Corp.,* 565 So.2d at 903 ("Here, the threshold element of the promise or representation concerning liquor liability coverage is missing. The only 'representation' the insured testified to was that the insured had 'what it needed,' but such a statement does not rise to the level of specificity required to be a 'representation' of liquor liability coverage.").

The case I cited in denying Nova's motion for summary judgment on promissory estoppel, *Exec. Health Services v. State Farm Fire & Cas. Co.,* 498 So.2d 1268, 1269-70 (Fla. 2nd DCA 1986), *rev. denied,* 520 So.2d 561 (Fla. 1988) (denying review but stating that Second District's decision was consistent with *McBride*), does not call for a different result in light of the evidence presented at trial. In that case the Second District reversed a summary judgment order and explained that it could not determine whether the agent's statement – "that the policy provided full and complete liability coverage to the insured, except coverage for medical malpractice" – was a representation about coverage. It therefore remanded the matter for a trial. *See id.* at 1271. In other words, the Second District did not hold that such a statement by an agent was a representation about coverage as a matter of law.

Third, again assuming that CU had apparent authority to make representations about coverage on Nova's behalf, it was unreasonable for a sophisticated insured like Mr. Waserstein to ask an insurance agent about coverage for construction work without even bothering to read a policy already in his possession, and then assume that the representation made to him – that he was covered for the construction work and did not need to purchase additional coverage – meant that any possible problem would be taken care of by insurance. In other words, any reliance by Mr. Waserstein was

unreasonable. *See Freytes & Sons*, 565 So.2d at 903 ("At most, this statement is an expression of opinion that the insured expressed or understood needs had been met. Such a statement cannot reasonably be interpreted by an insured to mean that he has purchased insurance that covers any conceivable claim or contingency he may encounter. . . . Every policy has limitations and exclusions this one had a total of eighteen under the general liability portion of the policy."). *See also Vencor Hospitals*, 284 F.3d at 1185 (adopting decision of district court, which rejected hospital's promissory estoppel claim because hospital could not reasonably rely on insurer's acknowledgment that insureds were covered for type of treatment proposed by hospital to mean that insurer would pay full cost of such treatment). To the extent that Mr. Waserstein interpreted Ms. Barrionuevo's statements as meaning that he and 1108 were fully covered, Mr. Waserstein would have had a duty to inquire about the authority of anyone at CU to make such a broad representation about coverage. *See Steele*, 691 So.2d at 528 (insurance applicant had duty to inquire with respect to independent agent's authority to explain whether medical history, which was required in application, would be significant to insurer). Mr. Waserstein never made any such inquiry.

Fourth, Mr. Waserstein and 1108 have not proven detrimental reliance by clear and convincing evidence. Mr. Waserstein testified that he would have obtained additional coverage but for Ms. Barrionuevo's statements, but there was no evidence at trial with respect to whether separate pollution coverage existed in 2002-2004, what limitations or exclusions such additional coverage would have had, what the cost of such coverage would have been, and whether 1108 would have qualified for such coverage in light of the pending construction/renovation. *See State Farm Fire & Cas. Ins. Co. v. Ortiz*, 560 So.2d 1350, 1351 (Fla. 3rd DCA 1990).

Fifth, promissory estoppel sounds in equity, and under the circumstances presented here, rejection of the estoppel defense would not "virtually . . . sanction the perpetration of fraud or . . . result in other injustice." *McBride*, 517 So.2d at 662. The Lloyd's policies that CU procured for 1108 and Mr. Waserstein in 200-2001 and 2001-2002 had numerous exclusions, including pollution exclusions. Mr. Waserstein failed to review or read these policies. The Nova policies that CU procured for 1108 and Mr. Waserstein in 2002-2003 and 2003-2004 also had exclusions, including pollution exclusions. Significantly, Mr. Waserstein had the 2002-2003 Nova policy in his possession when he spoke to Ms. Barrionuevo about coverage for construction/renovation, but he had not read

it or reviewed it. In short, equity does not call for a verdict in favor of Mr. Waserstein and 1108. *Cf. Nova Information Systems, Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1005 (11th Cir. 2004) (under Florida law, neither equitable or promissory estoppel "may be 'invoked to enlarge or extend coverage specified in a contract,' unless the oral representations or promises are interpretations of ambiguous contract terms").

### IV. CONCLUSION

Mr. Waserstein and 1108 have failed to establish their defense of promissory estoppel by clear and convincing evidence. I therefore find in favor of Nova on this defense.

DONE and ORDERED in chambers in Miami, Florida, this 11th day of October, 2006.

*Adalberto Jorge*
Adalberto Jordan
United States District Judge

Copy to:    Magistrate Judge Torres
            All counsel of record